JN:ELM/MGD
F. #2018R01268

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

JING DENG,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT IN SUPPORT OF APPLICATION FOR ARREST AND SEARCH WARRANTS

19-M-1089

(T. 18, U.S.C., § 1347)

IN THE MATTER OF AN APPLICATION OF THE UNITED STATES OF AMERICA FOR A SEARCH WARRANT FOR THE PREMISES KNOWN AND DESCRIBED AS 4233 KISSENA BOULEVARD, SUITE 1A, FLUSHING, QUEENS, NEW YORK AND ELECTRONIC DEVICES AND LOCKED AND CLOSED CONTAINERS FOUND THEREIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

NADEEM AFZAL, being duly sworn, deposes and states that he is a Special Agent with the United States Department of Health and Human Services, Office of the Inspector General ("HHS-OIG"), duly appointed according to law and acting as such.

In or about and between January 2014 and January 2019, within the Eastern District of New York, the defendant JING DENG did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a healthcare benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and did obtain and attempt to obtain by means of false and fraudulent pretenses, representations

and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for healthcare benefits, items and services.

(Title 18, United States Code, Section 1347)

Upon information and belief, there is probable cause to believe that there is located in 4233 KISSENA BOULEVARD, SUITE 1A, FLUSHING, QUEENS, NEW YORK AND ELECTRONIC DEVICES AND LOCKED AND CLOSED CONTAINERS FOUND THEREIN (the "SUBJECT PREMISES") evidence, fruits and/or instrumentalities of healthcare fraud and attempted healthcare fraud, in violation of 18 U.S.C. § 1347.

The source of your deponent's information and the grounds for his belief are as follows:

1. I have been a Special Agent with HHS-OIG for approximately two and a half years. Previously, I worked as an auditor with the United States Department of Labor, Office of the Inspector General. I am currently assigned to investigate fraud involving federal healthcare programs, including schemes to defraud Medicare and Medicaid. During my tenure at HHS-OIG, I have participated in a variety of criminal healthcare fraud investigations, during the course of which I have interviewed witnesses, conducted physical surveillance, executed search warrants and reviewed documents and records, including Medicare claims data, bank records, phone records, Medicare beneficiaries' medical records, invoices, and other records. I am familiar with the records and documents maintained by healthcare providers and the laws and regulations related to administration of the Medicare program. Through my training, education and experience, I am familiar with the techniques

and methods of operation used by individuals involved in criminal healthcare fraud to conceal their activities and avoid detection by law enforcement.

2.       Among other duties, I am currently participating in an investigation of violations of, among other things, healthcare fraud and attempted healthcare fraud pursuant to 18 U.S.C. § 1347 by the defendant JING DENG.   Specifically, the investigation is focused on a scheme involving the fraudulent submission of claims for reimbursement to Medicare for healthcare services that were not in fact provided.

3.       I make this Affidavit in support of an application for an arrest warrant for DENG and for a search warrant to search the SUBJECT PREMISES, as more fully described in Attachment A.   Based on the facts set forth in this Affidavit, I respectfully submit that there is probable cause to believe that there presently is located in the SUBJECT PREMISES certain items and property, which are more fully set forth in Attachment B, which constitute evidence, fruits and instrumentalities of healthcare fraud and attempted healthcare fraud, in violation of 18 U.S.C. § 1347.

4.       The facts and information contained in this Affidavit are based upon my own participation in the investigation, discussions with other federal law enforcement officers, records discovered in the course of this investigation that have been reviewed by myself and other law enforcement officers, my training and experience, and interviews with various individuals, including Medicare beneficiaries and the defendant JING DENG himself.[1]

---

[1]       Because the purpose of this Affidavit is to set forth only those facts necessary to establish probable cause to arrest the defendant JING DENG, and search the SUBJECT PREMISES, I have not described all the relevant facts and circumstances of which I am aware.

**PROBABLE CAUSE**

1. The Defendant and the Subject Premises

5. The defendant JING DENG is a medical doctor who has been licensed to practice in the state of New York since in or about October 1998. DENG specializes in physical medicine and rehabilitation.[2] DENG resides in Far Rockaway, in Queens, New York.

6. The defendant JING DENG maintains an office under the name "Good Care Medical" at the SUBJECT PREMISES. Law enforcement officers conducted surveillance of the SUBJECT PREMISES on November 14, 2019. Law enforcement officers also entered the SUBJECT PREMISES on November 14, 2019 as part of an undercover operation described herein, and determined that the office remains in operation. The office is located on the first floor of a six-story, multi-unit building with a red brick façade depicted in the first photograph below and in Attachment A. The front door of the building where the SUBJECT PREMISES is located is depicted in the second photograph included below and in Attachment A. There are multiple suites per floor in the building. DENG's office is Suite 1A, and it is located on the first floor and accessible from the street. A blue awning outside the building bears the name "Good Care Medical PC" and the names "Jing Deng, M.D." and "Lihua Mo, M.D." can be seen at the entrance to the SUBJECT PREMISES. Suite 1A within the SUBJECT PREMISES includes, among other areas, a reception and waiting area where patient files are stored.

[2] Physical medicine refers to the treatment of disease or injury through physical means – such as heat, electrotherapy, radiation or physical manipulation – instead of through surgery or medication.

Photograph #1



Photograph #2



2. Relevant Background

   A.    The Medicare Program

         7.     Medicare is a federal health insurance program for people who are 65

years of age or older, or certain younger people with disabilities and certain specified

illnesses. People who receive benefits under Medicare are referred to as Medicare

"beneficiaries." Medicare is a "health care benefit program" as defined by 18 U.S.C. § 24(b).

Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS").

CMS is a federal agency within the United States Department of Health and Human

Services.

         8.     Healthcare providers enrolled to participate in Medicare are assigned a

unique provider transaction access number (a "PTAN") for billing purposes.   After a

healthcare provider renders a service for a Medicare beneficiary, the provider uses their

PTAN, along with other information, to submit a claim for payment to the Medicare

contractor or carrier assigned to administer the program in the provider's state.

         9.     To receive payment for a service covered by Medicare, the healthcare

provider must submit a claim for payment electronically or in writing.   The claim must

include, among other information: identifying information for the provider; the physician

providing the service; identifying information for the patient; the services provided; the

diagnosis or nature of the illness or condition treated; and the date or dates of service.   The

claim identifies the service provided by reference to codes, including but not limited to

Current Procedural Terminology codes ("CPT Codes").   CPT Codes are comprised of five

alphanumerical digits and identify medical procedures and services performed by physicians

or other licensed healthcare providers.

B. Relevant Medical Procedures and Codes

10. Medicare will reimburse providers for certain diagnostic and therapeutic procedures on the musculoskeletal system[3] performed on beneficiaries, including, as relevant here: the injection of Orthovisc into the knee of a patient suffering from osteoarthtitis or other knee pain; the examination of the patient's entire knee joint or entire leg via ultrasound for diagnostic purposes prior to injecting the Orthovisc; and the use of ultrasound technology to assist the physician in guiding the Orthovisc injections. As relevant here, the CPT Codes related to these procedures are as follows:

| CPT Code | Description of Procedure |
|---|---|
| 20610 | Injection into a major joint or joint capsule |
| 20611 | Injection into a major joint or joint capsule with recording and reporting using ultrasound guidance |
| 76881 | Complete ultrasound of joint of arm or leg |
| 76942 | Ultrasonic guidance for needle placement, imaging supervision and interpretation |
| J7324 | Orthovisc injection (per dose) |

11. Based on my training, experience and research, I know that Orthovisc is a thick fluid made from hyaluronan, which is similar to the fluid that surrounds joints in the human body. Orthovisc is used to treat knee pain and is administered by injection. Orthovisc is packaged by the manufacturer in single-dose and single-use prefilled syringes. The manufacturer recommends administering Orthovisc injections in cycles, during which the patient receives one injection per week for a total of three or four injections per knee (or

[3] The term "musculoskeletal system" refers to the combination of the muscular and skeletal systems working together. It includes bones, muscles, tendons and ligaments.

six to eight total injections). The manufacturer recommends administering one cycle of injections in a six-month period.

12. Based on my training, experience and research, I know that the administration of a single-dose Orthovisc injection with the assistance of ultrasound guidance is properly billed using CPT Codes 20611 and J7324. The combined use of CPT Codes 20610 and 76942 (which refer to, as applicable here, the administration of an injection into a major joint and the use of ultrasound guidance to guide an injection, respectively), instead of the comprehensive (or "bundled") CPT Code 20611, results in a higher rate of reimbursement to the provider than the use of CPT Code 20611 alone.

13. In submitting a claim to Medicare for these and other procedures, a healthcare provider certifies, among other things, that the services were actually provided to the patient-beneficiary, and that the services were medically necessary.

3. The Fraudulent Scheme

14. Under 18 U.S.C. § 1347, it is illegal to knowingly and willfully execute and attempt to execute a scheme and artifice to defraud Medicare and to obtain and attempt to obtain, by means of false and fraudulent pretenses, representations and promises, money and property owned by and under the custody and control of Medicare in connection with the delivery of and payment for healthcare benefits, items and services. There is probable cause to believe that the defendant JING DENG has engaged in violations of 18 U.S.C. § 1347. Specifically, as described below, there is probable cause to believe that DENG, while practicing medicine in Queens, New York, engaged in a scheme to submit claims for payment to Medicare for diagnostic procedures that were not performed and for medical treatment that was not provided. Additionally, DENG engaged in a scheme to intentionally

inflate his claims to Medicare for services that were performed by "unbundling" his claims for reimbursement. "Unbundling" refers to the practice of submitting claims for multiple CPT Codes for a course of treatment or group of procedures that is normally covered by a single CPT Code in order to receive a higher rate of reimbursement.

15.     Specifically, the defendant JING DENG has submitted claims to Medicare seeking payment for the injection of Orthovisc, an injectable form of hyaluronan, into patients' knees at a higher reimbursement rate and in a greater quantity than he actually provided those injections. DENG further submitted claims stating that he performed a complete diagnostic ultrasound of the patients' joints before injecting the Orthovisc, when, in fact, he did not perform any such ultrasound.

16.     Additionally, the defendant JING DENG submitted claims for reimbursement for the administration of Orthovisc injections with the assistance of ultrasound technology though multiple CPT Codes, despite the fact that this procedure is normally covered by a single, comprehensive CPT Code that results in a lower reimbursement rate than the multiple codes used by DENG. Specifically, DENG performed gel injections into the knees of Medicare beneficiaries with the assistance of ultrasound technology and submitted claims for reimbursement using CPT Codes 20610, 76942 and J7324 (the "Unbundled Orthovisc Injection Codes") instead of the comprehensive CPT Codes 20611 and J7324 (the "Comprehensive Orthovisc Injection Codes").

17.     According to Medicare enrollment documents bearing the defendant JING DENG's signature, DENG is a medical doctor who is licensed to practice in the state of New York. He practices medicine through two New York state professional

corporations, Jing Deng MD Rehabilitation PC and Good Care Medical PC, each of which has a unique PTAN used for billing Medicare (the "DENG PTANs").

18. The defendant JING DENG currently practices medicine at three locations: the SUBJECT PREMISES; 139 Centre Street, Suite 708, New York, New York (the "Centre Street Office")[4]; and 800 Second Avenue, New York, New York (the "Midtown Office"). He previously practiced medicine at a fourth office located at 833 56th Street, Floor 1, Brooklyn, New York (the "Brooklyn Office"), which closed in 2018.

A. May 8, 2019 Visit to the Centre Street Office

19. On May 8, 2019, federal law enforcement officers with HHS-OIG visited the Centre Street Office at approximately 2:00 p.m. The office was open and the officers observed a few patients waiting to meet with the defendant JING DENG. When they arrived, the law enforcement officers introduced themselves to DENG as HHS employees, and spoke to DENG in an office at the back of the Centre Street Office space.

20. The defendant JING DENG informed the officers that he has medical offices in Flushing (where the SUBJECT PREMISES is located) and in Midtown Manhattan (where the Midtown Office is located). DENG stated that Biller Number One, an individual whose identity is known to me, does the billing for the Centre Street Office and that Biller Number Two, an individual whose identity is known to me, does the billing for the SUBJECT PREMISES and the Midtown Office.

[4] Law enforcement officers are seeking a search warrant for the Centre Street Office as part of this investigation.

B.     Interviews of Biller Number One

21.     On May 24, 2019, federal law enforcement officers with HHS-OIG visited the Centre Street Office at approximately 11:30 a.m.   The office was open, but the defendant JING DENG was not present.   When they arrived, the law enforcement officers introduced themselves to Biller Number One as HHS employees.   Biller Number One stated that s/he does the billing for the Centre Street Office, and explained that s/he inputs information provided by DENG into the billing system.

22.     Biller Number One provided the officers with three examples of a document titled "OV, Inj, US and EMG Billing Sheet" ("Billing Sheet").   The Billing Sheet was a form that seeks information about each of the defendant JING DENG's office visits, including the patient's name and the date of service.   The Billing Sheet also identified a number of different medical procedures and services and their corresponding CPT Codes, and allowed the user to indicate which services were provided to the specified patient on the specified date.   Biller Number One explained that, typically, DENG filled in a Billing Sheet by hand, including the date of service and checkmarks to indicate the procedures and services provided.   Biller Number One would then input the information provided by DENG into the billing system, and, in cases where DENG's patients were Medicare beneficiaries, Biller Number One would submit claims to Medicare electronically on DENG's behalf using the DENG PTANs.   Biller Number One informed the officers that the completed Billing Sheets were maintained in the patient's file.

23.     On October 25, 2019, federal law enforcement officers with HHS-OIG and the Federal Bureau of Investigation (the "FBI") interviewed Biller Number One by telephone.   The law enforcement officers each identified themselves to Biller Number One.

24.     During the interview, Biller Number One stated that s/he began

working for the defendant JING DENG in 2012 or 2013.   Biller Number One did not

directly interact with DENG's patients, but understood that DENG provided injections to

many of his patients.   Biller Number One explained that, after treating his patients, DENG

filled out a hardcopy Billing Sheet that identified the injections and treatment he purportedly

provided, as well as the corresponding CPT Codes.   Biller Number used the CPT Codes

identified by DENG on the Billing Sheets to submit billing claims to Medicare and other

insurance providers using the DENG PTANs.

25.     Biller Number One received training on how to enter the billing

information and submit claims for reimbursement at the SUBJECT PREMISES.   Biller

Number One was trained by Biller Number Two, who employed the system described above

to enter and submit billing information to Medicare for the SUBJECT PREMISES and the

Midtown Office.

C.     October 25, 2019 Interview of the Defendant JING DENG

26.     On October 25, 2019, federal law enforcement officers with HHS-OIG

and the FBI visited the Centre Street Office at approximately 12:40 p.m.   The office was

open and several patients were on-site at the time.   When they arrived, the law enforcement

officers informed the receptionist that they were there from HHS-OIG and the FBI and asked

to speak to the defendant JING DENG.

27.     The defendant JING DENG stated that he opened the SUBJECT

PREMISES in 2000, and that he sees patients there on Saturdays.   He further stated that

another doctor maintains a practice in the SUBJECT PREMISES.[5] DENG stated that he opened the Centre Street Office in 2010 or 2011, and sees patients there on Wednesdays and Fridays. DENG stated that he provides various treatments to his patients, including but not limited to injection treatments with Orthovisc to patients with knee pain. DENG stated that he provides Orthovisc injections "very occasionally."

28. The defendant JING DENG stated that, when he does provide Orthovisc injections, he generally adhered to the guidelines issued by the American Board of Rheumatology and provided the injections at a rate of four injections per knee every six months, or eight injections per knee each year. DENG stated that he sometimes provided patients who were experiencing severe knee pain with one or two additional injections per cycle. Typically, patients came into DENG's office and received one injection in one knee each week, until the patient received eight injections and the cycle was complete. DENG stated that he generally provided a patient with one injection in one knee during a single office visit, and that the patient would return the next week to receive one injection in the other knee. DENG stated that he never provided more than one injection per knee in a single visit.

29. The defendant JING DENG stated that he used an ultrasound machine to guide the Orthovisc injections. DENG said that he performed the ultrasounds and injections himself, without assistance. DENG stated that he owns a Terason t3200 Ultrasound System (the "Terason Ultrasound"), an ultrasound machine. The machine is

---

[5] Based on the investigation and my experience, I believe that the other doctor mentioned by the defendant JING DENG is Dr. Lihua Mo and that Dr. Mo has a separate office within the SUBJECT PREMISES. The separate office belonging to Dr. Mo is not included in this application and will not be searched.

portable and he transported it with him from one of his offices to another. Law enforcement agents observed the machine in the office. Based upon my review of the manufacturer's website, the Terason Ultrasound is marketed as a portable ultrasound machine that is able to, among other functionalities, assist in the accurate placement of needles. However, based upon my review of the manufacturer's website, the Terason Ultrasound is not marketed as a tool for performing complete ultrasounds of joints or limbs.

30.     The defendant JING DENG also described his typical office visit and billing protocol. First, a patient walked into his office and signed in with the receptionist. Then, DENG examined and treated the patient in an examination room. DENG wrote down the treatment provided on a Billing Sheet, which included the corresponding CPT Codes, and provided the Billing Sheet to Biller Number One or Biller Number Two. Biller Number One and Biller Number Two used the information on the Billing Sheets to submit the claims to Medicare and other insurance providers for payment.

D.      November 14, 2019 Undercover Visit to the SUBJECT PREMISES

31.     On November 14, 2019, federal law enforcement officers with HHS-OIG visited the SUBJECT PREMISES at approximately 10:15 a.m. The office had recently opened for the day and no patients were on site at the time.

32.     An undercover law enforcement officer approached the receptionist and identified him/herself as a potential new patient. The officer requested an appointment with the defendant JING DENG. The receptionist confirmed that DENG was accepting new patients and seeing patients at the SUBJECT PREMISES on Saturdays.

33. The undercover officer observed multiple patient files stored in the reception area of the office on a shelf behind the receptionist's desk.[6]

E. The Defendant JING DENG's Billing Practices

34. Law enforcement officers reviewed claims the defendant JING DENG submitted to Medicare between January 9, 2014 and January 31, 2019. Contrary to his representation to HHS-OIG officers that he "very occasionally" administered Orthovisc injections, DENG sought reimbursement from Medicare for approximately 6,147 Orthovisc injections between January 2014 and January 2019.

F. Patient Interviews

35. Law enforcement officers have also conducted interviews of several patients for whom the defendant JING DENG claimed reimbursement from Medicare for Orthovisc injections (collectively, the "Patients").

i. Patient Number One

36. Patient Number One, an individual whose identity is known to me, was a female Medicare beneficiary who was a patient of the defendant JING DENG between approximately February 2014 and January 2019. Law enforcement officers interviewed Patient Number One at her home on March 5, 2019. Patient Number One confirmed that

[6] Based on the investigation and my experience, I have identified certain individuals as patients of the defendant JING DENG. Of the patient files I expect will be found in the SUBJECT PREMISES, only those patient files for individuals who have been identified as patients of DENG will be seized.

DENG was her knee doctor since approximately 2011 or 2012, and that she was treated by DENG at the Queens Office (the SUBJECT PREMISES).[7]

37. During the interview, Patient Number One stated that she saw the defendant JING DENG at the SUBJECT PREMISES approximately every three weeks. Patient Number One explained that during these visits DENG drained fluid from her knee and then injected her knee with gel.[8] Patient Number One stated that she began receiving gel injections in her left knee in the fall of 2018. Previously, between approximately 2013 and late 2018, Patient Number One received steroid injections in her left knee and gel injections in her right knee. She stated that she had always received one gel injection in one knee per visit. DENG informed Patient Number One that she could receive a maximum of five injections in each knee in a six-month period. Patient Number One did receive approximately five gel injections per knee over the course of a six-month period, for approximately 20 gel injections per year. Patient Number One never received more than one gel injection per visit, and never received more than five gel injections in the same knee in a six-month period. Patient Number One stated that DENG uses an ultrasound machine to guide the injections.

38. The defendant JING DENG submitted claims to Medicare in connection with the administration of, and diagnostic imaging related to, Orthovisc injections

[7] Although Patient Number One received treatment only at the SUBJECT PREMISES, the defendant JING DENG submitted claims to Medicare for treatment provided to Patient Number One as having been performed at both the SUBJECT PREMISES and the Centre Street Office.

[8] Based on my training, experience and research, I know that Orthovisc and other similar injectable joint lubricators are viscous liquids that are sometimes referred to by healthcare providers as "gel injections."

he purportedly performed to treat Patient Number One's knee pain between approximately February 2014 and January 2019, including but not limited to the following:

a. During the calendar year 2018, DENG submitted claims for the administration of approximately 39 Orthovisc injections to Patient Number One.  Contrary to the facts provided by Patient Number One (who indicated that she received a total of 20 injections a year from DENG) and DENG's admissions to law enforcement, DENG's claims to Medicare indicate that he provided Patient Number One with nearly twice that number of injections in 2018.

b. On approximately 30 occasions between approximately April 2017 and January 2019, DENG submitted claims for the administration of two separate Orthovisc injections into one of Patient Number One's knees during a single office visit.  As noted above, Orthovisc injections are packaged by the manufacturer in prefilled single-dose, single-use syringes; two doses of Orthovisc would be administered by two separate injections.  Contrary to the facts provided by Patient Number One and DENG's statements to law enforcement, DENG's claims to Medicare indicated that DENG repeatedly provided Patient Number One with multiple injections of Orthovisc in the same knee during a single office visit.

c. On approximately 15 occasions between approximately February 2014 and February 2015, DENG submitted claims for treatment of Patient Number One using the Unbundled Orthovisc Injection Codes instead of the Comprehensive Orthovisc Injection Codes, resulting in a higher rate of reimbursement than if DENG had correctly billed the procedure using the Comprehensive Orthovisc Injection Codes.

ii. Patient Number Two

39. Patient Number Two, an individual whose identity is known to me, was a male Medicare beneficiary who was a patient of the defendant JING DENG for the period between approximately February 2014 and August 2018. Law enforcement officers interviewed Patient Number Two at his home on March 6, 2019. Patient Number Two confirmed that DENG was his knee doctor since approximately 2004, and that he was treated by DENG at the Centre Street Office.[9]

40. During the interview, Patient Number Two stated that he saw the defendant JING DENG at the Centre Street Office to receive injections in his knees for two cycles of injections each year. Each cycle consisted of four injections in each knee, administered one week apart. He received one cycle of injections in a six-month period. He had always received two injections per visit, one in each knee. DENG informed Patient Number Two that he could receive a maximum of four injections in each knee in a six-month period. Patient Number Two did receive approximately four gel injections per knee over the course of a six-month period, or approximately 16 injections per year. Patient Number Two never received more than one gel injection per knee in a single visit, and never received more than four gel injections in the same knee over a six-month period. Patient Number Two stated that DENG used an ultrasound machine to guide the injections.

41. The defendant JING DENG submitted claims to Medicare in connection with the administration of, and diagnostic imaging related to, Orthovisc injections

[9] The defendant JING DENG, submitted claims to Medicare for services provided to Patient Number Two as having been performed at the Centre Street Office.

he purportedly performed to treat Patient Number Two's knee pain between approximately February 2014 and August 2018, including but not limited to the following:

a.     DENG submitted claims referring to the administration of approximately 28 Orthovisc injections to Patient Number Two during the calendar year 2017 and approximately 36 Orthovisc injections to Patient Number Two during the calendar year 2018.   Contrary to the facts provided by Patient Number Two (who indicated that he received a total of 16 injections a year from DENG) and contrary to DENG's admissions to law enforcment, DENG's claims to Medicare indicate that he provided Patient Number Two with nearly twice that number of injections in 2017 and more than twice that number in 2018.

b.     Relatedly, on approximately 30 occasions between 2017 and 2018, DENG submitted claims referring to the administration of two separate Orthovisc injections into one of Patient Number Two's knees during a single office visit.   Contrary to the facts provided by Patient Number Two and DENG's admissions to law enforcement, DENG's claims to Medicare indicated that DENG provided Patient Number Two with multiple injections of Orthovisc in the same knee during a single office visit.

c.     On approximately 24 occasions between approximately February 2014 and June 2015, the defendant JING DENG submitted claims for treatment of Patient Number Two using the Unbundled Orthovisc Injection Codes instead of the Comprehensive Orthovisc Injection Codes, resulting in a higher rate of reimbursement than if DENG had correctly billed the procedure using the Comprehensive Orthovisc Injection Codes.

iii. Patent Number Three

42. Patient Number Three, an individual whose identity is known to me, was a female Medicare beneficiary who was a patient of the defendant JING DENG for the period between approximately February 2014 and December 2018. Law enforcement officers interviewed Patient Number Three at her home on March 5, 2019. Patient Number Three confirmed that DENG was her knee doctor since approximately 2009, and that she was treated by DENG at the Centre Street Office from approximately 2009 through 2011 and at the SUBJECT PREMISES from approximately 2012 through the present.[10]

43. During the interview, Patient Number Three stated that she saw the defendant JING DENG to receive injections in her knees for two cycles of injections each year. Each cycle consisted of five gel injections in each knee, administered one week apart. She received one cycle of injections in a six-month period. Patient Number Three always received two injections per visit, one in each knee. DENG informed Patient Number Three that she could receive a maximum of five injections in each knee in a six-month period. She did receive approximately five gel injections per knee over the course of a six-month period, or approximately 20 gel injections per year. Patient Number Three never received more than one gel injection per knee in a single visit, and never received more than five gel injections in the same knee over a six-month period. Patient Number Three stated that DENG used an ultrasound machine to guide the injections.

44. The defendant JING DENG submitted claims to Medicare in connection with the administration of, and diagnostic imaging related to, Orthovisc injections

[10] The defendant JING DENG submitted claims to Medicare for services provided to Patient Number Three as having been performed at the SUBJECT PREMISES.

he purportedly performed to treat Patient Number Three's knee pain between approximately February 2014 and December 2018, including but not limited to the following:

a.     On approximately 20 occasions between approximately July 2016 and December 2018, the defendant JING DENG submitted claims for the administration of two separate Orthovisc injections into one of Patient Number Three's knees during a single office visit.   Contrary to the facts provided Patient Number Three and contrary to DENG's admissions to law enforcement, DENG's claims to Medicare indicated that DENG provided Patient Number One with multiple injections of Orthovisc in the same knee during a single office visit.

b.     On approximately eight occasions between approximately February 2014 and May 2014, the defendant JING DENG submitted claims for the treatment of Patient Number Three using the Unbundled Orthovisc Injection Codes instead of the Comprehensive Orthovisc Injection Codes, resulting in a higher rate of reimbursement than if DENG had correctly billed the procedure using the Comprehensive Orthovisc Injection Codes.

iv.     Patient Number Four

45.     Patient Number Four, an individual whose identity is known to me, was a male Medicare beneficiary who was a patient of the defendant JING DENG for the period between approximately September 2016 and June 2018.   Law enforcement officers interviewed Patient Number Four at his home on March 5, 2019.   Patient Number Four

confirmed that DENG was his knee doctor for approximately one year between 2017 and 2018. He was treated by DENG at the SUBJECT PREMISES.[11]

46. During the interview, Patient Number Four stated that he saw the defendant JING DENG to receive injections in his knees. Patient Number Four stated that he received the injections in cycles consisting of four gel injections in each knee, administered one week apart. He received one cycle of injections in a six-month period. Patient Number Four received two cycles of injections from DENG. Patient Number Four never received more than one gel injection per knee in a single visit, and received a total of 16 injections from DENG. Patient Number Four stated that DENG used an ultrasound machine to guide the injections.

47. The defendant JING DENG submitted claims to Medicare in connection with the administration of, and diagnostic imaging related to, Orthovisc injections he purportedly performed to treat Patient Number Four's knee pain between approximately September 2016 and June 2018, including but not limited to the following:

a. On approximately 28 occasions, DENG submitted claims for treatment provided to Patient Number Four between approximately March 2017 and June 2018 referring to the administration of Orthovisc injections. Contrary to the facts provided by Patient Number Four (who indicated that he received a total of 16 injections from DENG) and contrary to DENG's admissions to law enforcement, DENG's claims to Medicare indicate that he provided Patient Number Four with nearly twice that number of injections.

[11] The defendant JING DENG submitted claims to Medicare for services provided to Patient Number Four as having been performed at the SUBJECT PREMISES.

b. Additionally, on each of these 28 occasions, the defendant JING DENG submitted claims referring to the administration of two separate Orthovisc injections into one of Patient Number Four's knees during a single office visit. Contrary to the facts provided by Patient Number Four and contrary to DENG's admissions to law enforcement, DENG's claims to Medicare indicated that DENG provided Patient Number Four with multiple injections of Orthovisc in the same knee during a single office visit.

v. Patient Number Five

48. Patient Number Five, an individual whose identity is known to me, was a female Medicare beneficiary who was a patient of the defendant JING DENG for the period between approximately January 2014 and August 2018. Law enforcement officers interviewed Patient Number Five at her home on March 6, 2019. Patient Number Five confirmed that DENG was her knee doctor since approximately 2004, and that she was treated by DENG at the Centre Street Office.[12]

49. During the interview, Patient Number Five stated that she saw the defendant JING DENG to receive injections in her knees for two cycles of injections each year. Each cycle consisted of four gel injections in each knee, administered one week apart. She received one cycle of injections in a six-month period. Patient Number Five had always received two injections per visit, one in each knee. She received approximately four gel injections per knee over the course of a six-month period, or approximately 16 gel injections per year. Patient Number Five never received more than one gel injection per knee in a

[12] DENG submitted claims to Medicare for services provided to Patient Number Five as having been performed at the Centre Street Office.

single visit.   Patient Number Five stated that DENG used an ultrasound machine to guide the injections.

50.     The defendant JING DENG submitted claims to Medicare in connection with the administration of, and diagnostic imaging related to, Orthovisc injections he purportedly performed to treat Patient Number Five's knee pain between approximately January 2014 and August 2018, including but not limited to the following:

a.     DENG submitted claims referring to the administration of approximately 47 Orthovisc injections to Patient Number Five during the calendar year 2017 and approximately 30 Orthovisc injections to Patient Number Five during the calendar year 2018.   Contrary to the facts provided by Patient Number Five (who indicated that she received a total of 16 injections a year from DENG) and contrary to DENG's admissions to law enforcement, DENG's claims to Medicare indicate that he provided Patient Number Five with nearly three times that number of injections in 2017 and nearly twice that number in 2018.

b.     On approximately 35 occasions, the defendant JING DENG submitted claims for treatment provided between approximately February 2017 and August 2018 referring to the administration of two separate Orthovisc injections into one of Patient Number Five's knees during a single office visit.   Contrary to the facts provided by Patient Number Five and contrary to DENG's admissions to law enforcement, DENG's claims to Medicare indicated that DENG provided Patient Number Five with multiple injections of Orthovisc in the same knee during a single office visit.

c.     On approximately 24 occasions between approximately January 2014 and June 2015, the defendant JING DENG submitted claims for the treatment of

Patient Number Five using the Unbundled Orthovisc Injection Codes instead of the Comprehensive Orthovisc Injection Codes, resulting in a higher rate of reimbursement than if DENG had correctly billed the procedure using the Comprehensive Orthovisc Injection Codes.

vi. Patient Number Six

51. Patient Number Six, an individual whose identity is known to me, is a male Medicare beneficiary who has been identified by Medicare as a patient of the defendant JING DENG between approximately January 2014 and November 2018. Law enforcement officers interviewed Patient Number Six at his home on March 7, 2019. Patient Number Six confirmed that DENG was his knee doctor since approximately 2009, and that he was treated by DENG at the Brooklyn Office.[13]

52. During the interview, Patient Number Six stated that he began receiving gel injections from the defendant JING DENG approximately two years ago, and that he administered two cycles of injections in his knees each year. Each cycle consisted of four gel injections in each knee, administered one week apart. He received one cycle of injections in a six-month period. Patient Number Six always received one injection per visit in one knee and completes the four-injection cycle for the first knee before receiving injections in the other knee. DENG informed Patient Number Six that he could receive a maximum of four injections in one knee in a six-month period. Patient Number Six did receive approximately four gel injections per knee over the course of a six-month period, or 16 gel injections per year. Patient Number Six never received more than one gel injection

[13] The defendant JING DENG submitted claims to Medicare for services provided to Patient Number Six as having been performed at the Centre Street Office.

per knee in a single visit.   Patient Number Six stated that DENG used an ultrasound machine to guide the injections.   Patient Number Six stated that he did not receive any full ultrasounds of his knee from DENG.

53.   The defendant JING DENG submitted claims to Medicare in connection with the administration of, and diagnostic imaging related to, procedures he purportedly performed to treat Patient Number Six's knee pain between approximately January 2014 and November 2018, including but not limited to the following:

a.   DENG submitted approximately 63 claims using CPT Code 76881, referring to a complete ultrasound of a joint of an arm or leg between approximately July 2014 and October 2018.   Contrary to the facts provided by Patient Number Six, DENG's claims to Medicare indicated that DENG routinely performed a full ultrasound of each of Patient Six's knees.

b.   Additionally, the defendant JING DENG submitted claims referring to the administration of approximately 41 Orthovisc injections to Patient Number Six during the calendar year 2017.   Contrary to the facts provided by Patient Number Six (who indicated that he received a total of 16 injections a year from DENG) and contrary to DENG's admissions to law enforcement, DENG's claims to Medicare indicate that he provided Patient Number Six with more than twice that number of injections in 2017.

c.   On approximately 16 occasions, the defendant JING DENG submitted claims for treatment provided between approximately August 2017 and December 2017 for the administration of two separate Orthovisc injections into one of Patient Number Six's knees during a single office visit.   Contrary to the facts provided by Patient Number Six and DENG's admissions to law enforcement, DENG's claims to Medicare indicated that

DENG provided Patient Number Six with multiple injections of Orthovisc in the same knee during a single office visit.

vii. Patient Number Seven

54. Patient Number Seven, an individual whose identity is known to me, is a male Medicare beneficiary who was a patient of the defendant JING DENG for the period between approximately April 2015 and July 2018. Law enforcement officers interviewed Patient Number Seven at his home on March 7, 2019. Patient Number Seven confirmed that DENG was his knee doctor for three to four years and that he was treated by DENG at the Brooklyn Office.[14] Patient Number Seven stopped seeing DENG when DENG closed the Brooklyn Office.

55. During the interview, Patient Number Seven stated that the defendant JING DENG drained fluid from his knees and administered gel injections into his knees. DENG provided the gel injections in cycles, and each cycle consisted of five gel injections in each knee, administered one week apart. He received one cycle of injections in a six-month period. DENG informed Patient Number Seven that he could receive a maximum of five injections per knee in a six-month period. Patient Number Seven did receive approximately five gel injections per knee over the course of a six-month period, or 20 gel injections per year. Patient Number Seven never received more than one gel injection per knee in a single visit. Patient Number Seven stated that DENG used an ultrasound machine to guide the injections. Patient Number Seven stated that he received one full ultrasound of his knees when he first consulted DENG. DENG referred Patient Number Seven to a hospital on

[14] The defendant JING DENG submitted claims to Medicare for services provided to Patient Number Seven as having been performed at the Centre Street Office.

Third Avenue in Brooklyn for the complete ultrasound. Patient Number Seven did not

receive any other full ultrasounds of his knees.

56.     The defendant JING DENG submitted claims to Medicare in

connection with the administration of, and diagnostic imaging related to, procedures he

purportedly performed to treat Patient Number Seven's knee pain between April 2015 and

July 2018, including but not limited to the following:

a.      DENG submitted approximately 65 claims using CPT Code

76881, referring to a complete ultrasound of a joint of an arm or leg between approximately

April 2105 and July 2018. Contrary to the facts provided by Patient Number Seven,

DENG's claims to Medicare indicated that DENG routinely performed a full ultrasound of

each of Patient Seven's knees.

b.      DENG submitted claims referring to the administration of

approximately 28 Orthovisc injections to Patient Number Seven during the calendar year

2016, approximately 36 Orthovisc injections during the calendar year 2017 and

approximately 28 Orthovisc injections between January and July 2018. Contrary to the facts

provided by Patient Number Seven (who indicated that he received a total of 20 injections a

year from DENG) and contrary to DENG's admissions to law enforcement, DENG's claims

to Medicare indicate that he provided Patient Number Seven with nearly twice that number

of injections in 2016, twice that number of injections in 2017 and nearly twice that number

of injections during the first half of 2018.

c.      On approximately 30 occasions, DENG submitted claims for

treatment provided between approximately April 2017 and July 2018 for the administration

of two separate Orthovisc injections into one of Patient Number Seven's knees during a

single office visit. Contrary to the facts provided by Patient Number Seven and contrary to DENG's admissions to law enforcment, DENG's claims to Medicare indicated that DENG provided Patient Number Seven with multiple injections of Orthovisc in the same knee during a single office visit.

d. On approximately four occasions in May 2015, DENG submitted claims for the treatment of Patient Number Seven using the Unbundled Orthovisc Injection Codes instead of the Comprehensive Orthovisc Injection Codes, resulting in a higher rate of reimbursement than if DENG had correctly billed the procedure using the Comprehensive Orthovisc Injection Codes.

viii. Patient Number Eight

57. Patient Number Eight, an individual whose identity is known to me, is a male Medicare beneficiary who was a patient of the defendant JING DENG for the period between approximately January 2016 and October 2018. Law enforcement officers interviewed Patient Number Eight at his home on March 7, 2019. Patient Number Eight confirmed that DENG was his knee doctor since approximately 2013, and that he was treated by DENG at the Brooklyn Office.[15]

58. During the interview, Patient Number Eight stated that the defendant JING DENG administered gel injections into his knees. DENG informed Patient Number Eight that he could receive a maximum of five or six injections in each knee per year. Patient Number Eight did receive approximately five or six gel injections in each knee per year, or approximately 10 to 12 gel injections per year. Patient Number Eight never

---

[15] The defendant JING DENG submitted claims to Medicare for services provided to Patient Number Eight as having been performed at the Centre Street Office.

received more than one gel injection in a single visit. Patient Number Eight stated that DENG uses an ultrasound machine to guide the injections. Patient Number Eight stated that he received one full ultrasound of his knees, but it was not performed at DENG's office. Patient Number Eight did not receive any other full ultrasounds of his knees.

59. The defendant JING DENG submitted claims to Medicare in connection with the administration of, and diagnostic imaging related to, procedures he purportedly performed to treat Patient Number Eight's knee pain between approximately January 2016 and October 2018, including but not limited to the following:

a. DENG submitted approximately 66 claims using CPT Code 76881, referring to a complete ultrasound of a joint of an arm or leg between January 2016 and October 2017. Contrary to the facts provided by Patient Number Eight, DENG's claims to Medicare indicated that DENG routinely performed a full ultrasound of each of Patient Eight's knees.

b. DENG submitted claims referring to the administration of approximately 34 Orthovisc injections to Patient Number Eight during the calendar year 2016, 48 Orthovisc injections during the calendar year 2107 and 28 Orthovisc injections during the calendar year 2018. Contrary to the facts provided by Patient Number Eight (who indicated that he received a total of 12 injections a year from DENG), DENG's claims to Medicare indicate that he provided Patient Number Eight with nearly three times that number of injections in 2016, four times that number of injections in 2017 and more than twice that number of injections in 2018.

c. On approximately 46 occasions, DENG submitted claims for treatment provided between approximately October 2016 and October 2018 for the

administration of two separate Orthovisc injections into one of Patient Number Eight's knees during a single office visit. Contrary to the facts provided by DENG and Patient Number Eight, DENG's claims to Medicare indicated that DENG provided Patient Number Eight with multiple injections of Orthovisc in the same knee during a single office visit.

G. Patients' Claims Data and the Loss Caused by the Defendant JING DENG

60. As to each of the Patients, the defendant JING DENG submitted the following claims for reimbursement to Medicare, and received the following payments:

a. For each paid claim that he had administered a complete diagnostic ultrasound of a knee under CPT Code 76881, the defendant JING DENG submitted a claim for payment of between approximately $133.73 and $200.00 to Medicare and received a payment of between approximately $96.29 and $111.03.

b. On average,[16] for each paid claim for administration of a single dose of Orthovisc under CPT Code J7324, the defendant JING DENG submitted a claim for payment of approximately $408.00 to Medicare and received a payment of approximately $127.00.

c. On average, for each paid claim that he had administered two doses of Orthovisc into one knee during a single office visit under CPT Code J7324, the defendant JING DENG submitted a claim for payment of approximately $527.00 to Medicare and received payment of approximately $232.00.

d. On average, for each paid claim that was billed using the Unbundled Orthovisc Injection Codes (i.e., billing three CPT Codes rather than two for the ultrasound-

[16] The amount of each claim submitted and reimbursed varied throughout the time period encompassed by the scheme. The dollar amounts set forth in this section represent an average amount based upon the total dollar amounts and total number of claims for the entire time period.

guided injection and its contents), the defendant JING DENG submitted a claim for payment of approximately $808.00 to Medicare and received a payment of approximately $266.00 per claim. DENG would have received a payment of approximately $218.28 per claim from Medicare if he had properly used the Comprehensive Orthovisc Injection Codes, for a difference of approximately $47.72 per Unbundled Orthovisc Injection on average.

61. The defendant JING DENG submitted approximately $1,483,668 in fraudulent claims for complete joint ultrasounds and double-billed Orthovisc injections to Medicare between January 2014 and January 2019 in connection with the fraudulent scheme described above. DENG received approximately $716,465 in payments from Medicare in connection with fraudulent claims for complete joint ultrasounds and double-billed Orthovisc injections.

62. Based on my training and experience – including my participation in this investigation – I have learned that individuals who engage in fraudulent conduct like the scheme described herein often keep physical evidence, fruits, and instrumentalities of their crimes inside their offices, including, in this case: both falsified and accurate medical records for patients, medical billing records,[17] documents identifying the procedures, if any, that

---

[17] Based on the investigation, it is my belief that the defendant JING DENG, maintains his patients' medical records and related Billing Sheets in hardcopy at the Centre Street Office and the SUBJECT PREMISES. Additionally, it is my belief that DENG maintains his billing records on the desktop computers in his office space. Among other things, Biller Number One informed law enforcement officers that s/he receives hardcopy patient files and Billing Sheets from DENG at the Centre Street Office, and that Biller Number Two likewise receives hardcopy patient files and Billing Sheets from DENG at the SUBJECT PREMISES. Biller Number One further informed law enforcement officers that s/he enters the information on the Billing Sheets into software saved on the desktop computers at the Centre Street Office, and that Biller Number Two likewise enters such information into software saved on the desktop computers at the SUBJECT PREMISES.

were actually performed on patients, and ledgers or other documents recording payments made or received in furtherance of the scheme.   I have also learned that such office spaces will include evidence of the healthcare providers using the office to practice medicine.

63.      Additionally, I have learned through my training, education and experience that such evidence, fruits and instrumentalities are often stored in locked containers, safes, secret compartments, closets, drawers, above or below ceiling and floor tiles, behind false walls and, when digital in nature, inside locked or lockable electronic devices (e.g., computers and smart telephones) and in other places intended to avoid detection by other people, including law enforcement.

64.      Accordingly, and based on all of the above, I submit that there is probable cause to believe that the SUBJECT PREMISES, and any closed and/or locked containers found therein, will contain evidence, fruits and instrumentalities of the healthcare fraud and attempted healthcare fraud, in violation of 18 U.S.C. § 1347, and that the SUBJECT PREMISES, and any closed and/or locked containers found therein, will also contain electronic devices that will contain (and will, in and of themselves, constitute) further evidence, fruits and instrumentalities of the healthcare fraud.[18]

---

Additionally, Biller Number One informed law enforcement officers that the Billing Sheets are maintained in hardcopy in the patient files.   Finally, on November 14, 2019, an undercover law enforcement officer observed patient medical records in the SUBJECT PREMISES.

[18] This application does not encompass items that may be found within any separate office maintained within the SUBJECT PREMISES by any physician other than the defendant JING DENG.   No such separate office will be searched and no items located in such separate office will be seized.   Moreover, because the search will begin before normal business hours, no other third-party electronic devices are likely to be found within the portions of the SUBJECT PREMISES to be searched.

**TECHNICAL TERMS**

67. Based on my training and experience, I use the following technical terms to convey the following meanings:

(a) Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

(b) Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

**COMPUTERS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

68. As described above and in Attachment B, this application seeks permission to search for certain documents and records that might be found in the SUBJECT PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

69. *Probable cause.* I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.

Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

70. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that

establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of

occupancy" while executing a search warrant at a residence.   The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.   Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.   For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.   Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.   Such file data typically also contains information indicating when the file or image was created.   The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).   The geographic and timeline information described herein may either inculpate or exculpate the computer user.   Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.   For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the

computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.       A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.       The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.   While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.   Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.       Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.   For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

71.     *Necessity of seizing or copying entire computers or storage media.*   In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant.   In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.   Generally speaking, imaging

is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

      a.     The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

      b.     Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

72. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the law enforcement officers executing this warrant to image, or otherwise copy, storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant. In the event that the law enforcement officers executing the warrant are unable to image, or otherwise copy, storage media encompassed by the warrant on-site, the warrant I am applying for would permit law enforcement officers executing the warrant to seize such storage media for a reasonable amount of time, in order to complete the imaging, or other copying, process at an off-site location.

**REQUEST FOR SEALING**

73. I respectfully request that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application, arrest warrant and search warrant. I believe that sealing these documents is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organization as not all of the targets of this investigation will be arrested or searched at this time. Based upon my training and experience, I have learned

that online criminals actively search for law enforcement affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through various forums.   Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

**CONCLUSION**

WHEREFORE, your deponent respectfully requests that a warrant be issued for the arrest of the defendant JING DENG, so that he may be dealt with according to law. I further respectfully request that a warrant be issued, pursuant to Federal Rule of Criminal Procedure 41, to search the SUBJECT PREMISES, as further described in Attachment A, and to seize those items set forth in Attachment B, that may constitute evidence, fruits and instrumentalities of violations of 18 U.S.C. § 1347.

NADEEM AFZAL
Special Agent, HHS-OIG

Sworn to before me this
19th day of November, 2019

s/ Mann

THE HONORABLE
CHIEF UNITED ST
EASTERN DISTRIC

**ATTACHMENT A**

*Property to be Searched*

The property to be searched is a physician's office located at 4233 Kissena Boulevard, Suite 1A, Flushing, Queens in New York, and electronic devices and all locked and closed containers found therein (the "Subject Premises"). The Subject Premises is located on the first floor of a six-story, multi-unit building with a red brick façade. The name "Good Care Medical, P.C." and Jing Deng's name are on a blue awning above the door leading into the Subject Premises.



**ATTACHMENT B**

*Property to be Seized*

1. All items, including documents, records, evidence, fruits and instrumentalities, relating to violations of 18 U.S.C. § 1347, those violations involving the defendant JING DENG, and occurring in or between January 2014 and January 2019 but not limited to:

(a) Documents constituting, concerning, or relating to patient files, bills, invoices and claims for payment or reimbursement for services billed, provided, or alleged to have been provided to patients to include, but not limited to, reimbursement claim forms, explanations of medical benefits, dispensing orders, detailed written orders or prescriptions, certificates of medical necessity, information from physician(s) concerning the patients' diagnosis, superbills or "face sheets" indicating what procedures were performed for particular patients, and proof of delivery of services and/or items that were submitted by DENG or any representative acting on behalf of DENG, for those individuals identified in the investigation as being patients of DENG;

(b) All contracts, agreements, papers, and affiliated records constituting, concerning, or relating to the provision of medical services by DENG or any representative acting on his behalf, including but not limited to, manufacturer catalogs, purchase orders, invoices, and receipts;

(c) All letters constituting, concerning, or relating to efforts to collect co-payments and/or deductibles for individuals who may have received health care services from DENG;

(d) All correspondence and cancelled checks relating to notice of overpayment and request for refunds from Medicare or any other health insurance provider concerning DENG;

(e) All correspondence to and from Medicare or any other health insurance provider concerning DENG, including, but not limited to, manuals, advisories, newsletters, bulletins and publications;

(f) Financial books and records and documents constituting, concerning or relating to DENG, including but not limited to: bank accounts, money market accounts, checking accounts, investment accounts, securities accounts, 401k funds, mutual funds, retirement funds, and credit accounts, including deposits, disbursement, cancelled checks, draft electronic transfers, ledgers, loan statements, and loan agreements;

(g)    All contracts, agreements, logs, lists or papers affiliated with any medical professional services, referrals, or storage for DENG;

(h)    All contracts, agreements or paper affiliated with any medical insurance billing company for DENG.

2.    Computers or storage media used as a means to commit the violations described above, including healthcare fraud in violation of 18 U.S.C. § 1347. To the extent that law enforcement officials reviewing such computers or storage media identify material that pertains solely to the patients or practice of any physician other than the defendant JING DENG, such material shall be excluded from further review under this warrant.

3.    For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

(a)    evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

(b)    evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

(c)    evidence of the lack of such malicious software;

(d)    evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

(e)    evidence indicating the computer user's state of mind as it relates to the crime under investigation;

(f)    evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

(g)    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

(h)    evidence of the times the COMPUTER was used;

(i)    passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

    (j)      documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

    (k)      records of or information about Internet Protocol addresses used by the COMPUTER;

    (l)      records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

    (m)     contextual information necessary to understand the evidence described in this attachment.

    4.     Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant does not permit the seizure of any items from any separate office maintained within the SUBJECT PREMISES by any physician other than the defendant JING DENG.